# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | No. 11-434-54 |
| ANGEL DUPREY | : | |

## MEMORANDUM

**Schiller, J.**                                                                                                                                       April 8, 2013

      In the 368-count third superseding indictment, the Government charges numerous defendants with being part of vast drug distribution groups that obtained oxycodone pills from Defendant Dr. Norman Werther. The Government contends that group leaders and drivers brought groups of patients to Dr. Werther seeking oxycodone pills and that Dr. Werther, outside the usual course of professional practice and not for a legitimate medical purpose, prescribed these narcotics for a fee. Defendant Angel Duprey is alleged to be a member of the conspiracy. He filed a motion to suppress statements he made to police following his arrest. The Court held a suppression hearing on April 3, 2013, and heard oral argument on the motion. The Court denied the motion from the bench. This Memorandum explains the reasons behind that decision.

## I.     FACTS[1]

      The third superseding indictment claims that from February 2009 through August 2011, Dr. Werther set aside appointments for pseudo-patients controlled by Duprey. Duprey directed these pseudo-patients to claim they were in pain so that they could obtain oxycodone. Duprey would arrange transportation for the pseudo-patients to Dr. Werther's office and to a pharmacy to fill the

---

[1] These facts are taken from the suppression hearing held on April 3, 2013, including the summaries of events from officers admitted into evidence.

prescriptions. The pseudo-patients would turn over the oxycodone pills to one of Duprey's workers in exchange for a fee. Duprey would then sell the pills for a profit. The Government alleges that Duprey would pay for the office visit and contact Dr. Werther and his staff about the pseudo-patients, and sometimes pay a separate fee to Dr. Werther's staff. The Government also contends that on numerous occasions Duprey acted as a pseudo-patient.

On July 31, 2012, Officer Jeffrey Ford, acting as a Task Force Officer ("TFO") with the Drug Enforcement Agency ("DEA"), and TFO John Hipple assisted in the arrest of Duprey at 822 West Venango Street in Philadelphia. TFO Hipple knocked on Duprey's door. Duprey opened the door, and Officer Hipple informed Duprey that they had a warrant for his arrest. Duprey slammed the door shut. Officers forced the door open and arrested Duprey inside the residence.

Duprey was handcuffed and taken into custody. He was placed in an unmarked police vehicle. Duprey said nothing at that time. Officer Iezzi and Officer Ford transported Duprey to the Federal Building on Arch Street in Philadelphia. During the drive, Duprey asked Officers Ford and Iezzi why it took so long to arrest him. Officer Ford told Duprey that the process takes time. Duprey was silent for a while, but while in the car said, "I don't understand why I am being arrested, when Dr. Werther was the one running everything. Dr. Werther was controlling everything, like who came in the office and who didn't get it." Just prior to arriving at the Federal Building, Duprey stated that he was a poor man who was just making money driving people to the doctor because they did not speak English. Neither Officer Ford nor Officer Iezzi interrogated Duprey.

Once at the Federal Building, TFO Hipple and DEA Special Agent Eric Duble advised Duprey of his *Miranda* rights prior to Special Agent Duble questioning him. Duprey orally agreed to answer questions, which he did for a period of time. However, the interview was terminated when

Duprey asked to speak to a lawyer. Duprey was not threatened or coerced, and was responsive to the officers' questions.

**II. DISCUSSION**

The Fifth Amendment to the United States Constitution protects against self-incrimination: "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." A person must be informed of his *Miranda* rights, including the right to remain silent, if a custodial interrogation occurs. *See Miranda v. Arizona*, 384 U.S. 436 (1966). The Supreme Court's decision in *Miranda*, however, is inapplicable in the absence of a custodial interrogation. *See United States v. Brown*, 261 F. App'x 371, 374 (3d Cir. 2008) ("*Miranda* warnings are required only when a suspect is both in custody and subject to interrogation."). Moreover, not every statement obtained by police after a person is taken into custody results from interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980). "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Id*. at 300-01. Interrogation requires compulsion beyond that resulting from the custody itself and extends only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. *Id*. at 300-02.

The Court credits the testimony of Officer Ford and concludes that Duprey made unsolicited statements while being transported following his arrest. The officers arresting and transporting Duprey did not create a situation they should have known was likely to elicit an incriminating response from Duprey. Neither Officer Ford nor Officer Iezzi questioned Duprey. Furthermore, answering Duprey's question about the process leading to his arrest would not be expected to elicit

3

an incriminating response. Duprey was not subjected to a custodial interrogation at the time he made the statements at issue here and thus the statements are not subject to suppression under *Miranda*. *See United States v. Benton*, 996 F.2d 642, 644 (3d Cir. 1993) (holding that statement made by defendant following his arrest was not the product of custodial interrogation); *Brown*, 261 F. App'x at 374 ("The District Court found, however, that the police never interrogated Brown, who volunteered his statement without any prompting by police. Accordingly, the District Court correctly concluded that there was no Fifth Amendment violation.").

Duprey also contends that these spontaneous utterances should be suppressed because Officer Ford's summary of the statements includes inaccuracies and thus calls into question exactly what Duprey said while being transported. This is fodder for cross-examination during the trial but fails to call into question the legality of Officer Ford or Officer Iezzi's actions.

Duprey also seeks to suppress statements he made after he was read his *Miranda* rights. He claims that he never signed anything waiving those rights and that at some point, Office Duble might have lured Duprey into speaking by informing him that Duprey would have an opportunity to help himself.

A waiver of one's *Miranda* rights must be made "voluntarily, knowingly and intelligently" based on the totality of the circumstances. *Miranda*, 384 U.S. at 444. "Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence." *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

The Government has met its burden. Officer Hipple testified that Duprey was read his rights, understood his waiver of those rights, and that he was not coerced, threatened, or even touched.

4

There is no basis to find that Duprey's statements made following the reading of his *Miranda* rights were made involuntarily. Even if Officer Duble stated that Duprey's agreement to answer questions could help him, such a statement of possible lenience does not violate *Miranda*. *See United States v. Falciglia*, 421 F. App'x 146, 147 (3d Cir. 2008). Furthermore, the police were not obligated to obtain any waiver prior to questioning Duprey. *See Berghuis v. Thompkins*, 130 S. Ct. 2250, 2263-64 (2010) (concluding that *Miranda* is satisfied if witness is read his rights, understands them, and has an opportunity to invoke them prior to questioning). Thus, Duprey's oral waiver of his *Miranda* rights is no reason to suppress his statements. *See United States v. Harris*, Crim. A. No. 08-58, 2008 WL 5328843, at *4 (D. Del. Dec. 22, 2008) ("A valid *Miranda* waiver may be made orally or may be implied based on the defendant's conduct.").

### III.  CONCLUSION

Because the statements Duprey made while being transported did not result from custodial interrogation, they will not be suppressed. Because the statements Duprey made after he was brought to the Federal Building were made following a valid waiver of his *Miranda* rights, they will not be suppressed. An Order consistent with this Memorandum will be docketed separately.