**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL ACTION** |
| **v.** | : | |
| | : | **No. 11-434** |
| **NORMAN WERTHER,** *et al.* | : | |

**<u>MEMORANDUM</u>**

**Schiller, J.**                                                              **September 23, 2013**

According to the Government, Dr. Norman Werther was the center of multiple conspiracies in which individuals drove fake patients to Dr. Werther's office, where Dr. Werther performed perfunctory medical examinations and handed out prescriptions for Oxycodone. The prescriptions were filled, and the pills sold. Following a lengthy trial, Dr. Werther was convicted of over three hundred charges, including multiple counts of conspiracy, 186 counts of distribution of a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose, and numerous counts of money laundering. He was also convicted of distribution of a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose resulting in the death of Nathaniel Backes. Angel Duprey, a co-conspirator of Dr. Werther, was convicted of one count of conspiracy based on evidence that he drove patients to Dr. Werther and received pills from patients.

Presently before the Court are the motions of Dr. Werther and Duprey for judgment of acquittal, or, in the alternative, for a new trial. For the reasons that follow, the Court denies both motions.

## I. STANDARD OF REVIEW

### A. Rule 29

Rule 29 of the Federal Rules of Criminal Procedure provides that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." The court must view the evidence in the light most favorable to the prosecution and must uphold the verdict provided that any rational trier of fact could have found guilt beyond a reasonable doubt given the available evidence. *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). Defendants face an uphill battle under this "highly deferential standard." *United States v. Carbo*, 572 F.3d 112, 119 (3d Cir. 2009). Challenges to the sufficiency of the evidence supporting a jury verdict "should be confined to cases where the prosecution's failure is clear." *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002) (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1994)). The defendant bears the burden of proving that the Government's evidence was insufficient to convict. *United States v. Gonzalez*, 918 F.2d 1129, 1132 (3d Cir. 1990).

"Courts must be ever vigilant in the context of Federal Rule of Criminal Procedure 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *Brodie*, 403 F.3d at 133 (citing *United States v. Jannotti*, 673 F.2d 578, 581 (3d Cir. 1982) (en banc)).

### B. Rule 33

Rule 33 of the Federal Rules of Criminal Procedure permits a court to vacate any judgment and grant a new trial "if the interest of justice so requires." "[M]otions for new trials are disfavored and are only granted with great caution and at the discretion of the trial court." *United States v. Martinez*, 69 F. App'x 513, 516 (3d Cir. 2003) (citing *United States v. Allen*, 554 F.2d 398, 403

(10th Cir. 1977)).

Unlike a Rule 29 motion, a court does not view the evidence in the light most favorable to the government when considering a Rule 33 motion but rather exercises its own judgment in evaluating the government's case. *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). Nonetheless, "a district court 'can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.' " *United States v. Davis*, 397 F.3d 173, 181 (3d Cir. 2005) (quoting *Johnson*, 302 F.3d at 150). A court must grant a new trial if it concludes that the trial was beset by cumulative errors that so infected the jury's deliberations that they substantially influenced the trial's outcome. *United States v. Copple*, 24 F.3d 535, 547 n.17 (3d Cir. 1994).

## II. DISCUSSION

### A. Dr. Werther's Motion

#### 1. Nathaniel Backes

Count thirty-eight of the Third Superseding Indictment charged Dr. Werther with distribution of a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose resulting in the death of Nathaniel Backes. The law provides that "it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). Additionally, "if death or serious bodily injury results from the use of such substance," the law requires a prison sentence "of not less than twenty years or more than life." 21 U.S.C. §

841(b)(1)(C).

Dr. Werther argues that the Court "should grant judgment of acquittal as to [the charges involving Backes] because the evidence produced at trial did not establish that Dr. Werther's prescriptions were outside the usual course of professional practice and without a legitimate medical purpose, or that Oxycodone was the 'but for' cause of the Mr. Backes' death. Consequently, no rational trier of fact could have found proof of Dr. Werther's guilt beyond a reasonable doubt on these counts." (Dr. Norman Werther's Mot. for J. of Acquittal or, in the Alternative, Mot. for a New Trial [Werther Mem.] at 17-18.) Based on the evidence presented at trial and viewed in the light most favorable to the Government, the Court will not overturn the jury's verdict on the counts related to Backes. Furthermore, the evidence was sufficient to convict Dr. Werther of all counts involving Backes, and his motion for a new trial will therefore be denied.

a.       *Testimony about the cause of Backes's death*

Dr. Walter Hofman, the elected coroner of Montgomery County, performed an autopsy on Backes. (May 9, 2013 Trial Tr. at 21, 24.) He concluded, to a reasonable degree of medical certainty, that Backes died of "combined drug intoxication or polypharmacy due to cocaine; benzoylecgonine, which is a breakdown product of cocaine; and oxycodone." (*Id*. at 25, 66.) He concluded that Backes died of an overdose and listed the manner of death as an accident. (*Id*. at 25, 67.)

According to Dr. Hofman's testimony, on September 1, 2010, Dr. Werther wrote Backes a prescription for 150 thirty-milligram oxycodone. (*Id*. at 33.) Dr. Hofman testified that, in an eleven week period, Dr. Werther prescribed "an awful lot of [Oxycodone] pills" to Backes, specifically 600 thirty-milligram Oxycodone pills and 120 fifteen-milligram Oxycodone pills. (*Id*.) Dr. Hofman further testified that police seized from Backes's apartment Suboxone, Alprazolam (Xanax), an

empty bottle of Oxycodone, and three loose thirty-milligram Oxycodone pills. (*Id*. at 30-32.)

Seeing no outward signs of bodily injury on Backes, Dr. Hofman performed an internal examination of the body. (*Id*. at 34-35.) Backes showed no signs of organ damage. (*Id*. at 57.) After removing Backes's organs, Dr. Hofman noted four baggies present in Backes's lower colon and rectum. (*Id*. at 37.) An additional clear plastic baggie containing white powder was found in Backes's mouth. (*Id*. at 37.) Inside each of the five baggies was cocaine. (*Id*. at 52.) Additionally, a brown liquid residue had leaked into a few of the baggies. (*Id*.) Dr. Hofman testified, however, that he believed any seepage occurred post mortem, during his examination. (*Id*. at 59-62.) Additionally, Dr. Hofman stated that a baggie was damaged when he nicked it during the examination. (*Id*. at 64-65.) He did not believe that the cocaine in the baggies played any role in the death of Backes. (*Id*. at 64.)

An expanded post-mortem toxicology panel showed that Backes's blood contained 32 nanograms per millimeter of Xanax, 280 nanograms per millimeter of cocaine, 1700 nanograms per millimeter of benzoylecgonine, and 2000 nanograms per millimeter of Oxycodone. (*Id*. at 54-55.) According to Dr. Hofman, "the alprazolam was within therapeutic limits. The other three substances in and by themselves, each one could explain death." (*Id*. at 55.)

On cross-examination, Dr. Hofman conceded that at the time of Backes's death, he had a lethal dose of cocaine in his system, a lethal dose of benzoylecogine in his system, and a lethal dose of Oxycodone in his system. (*Id*. at 70, 94.) He could not identify which drug or drugs caused the death of Backes. (*Id*. at 71.) Counsel also challenged Dr. Hofman's testimony that he cut the baggie of cocaine during his examination of Backes, and that fluid had leaked into the baggies post mortem. (*Id*. at 81-84, 87-89.)

Dr. Edward Barbieri, a forensic toxicologist employed by NMS Labs ("NMS"), also testified as an expert for the Government. (May 10, 2013 Trial Tr. at 5, 7-8.) He discussed the tests of samples that NMS completed for the Backes case. Among other substances, Dr. Barbieri confirmed that Backes had Alprazolam, cocaine, benzoylecgonine, and Oxycodone in his system. (*Id*. at 12-13.) Dr. Barbieri testified that the amount of cocaine in Backes's blood was "a typical level that somebody would get from taking a line of cocaine, for example." (*Id*. at 16.) The 2000 nanograms per millimeter of Oxycodone was described as "a very large amount of Oxycodone." (*Id*. at 17.)

Dr. William Greenfield testified as a psychiatrist who has treated many patients with addictions. (*Id*. at 35.) He discussed Suboxone, which allows individuals to deal with an opiate addiction without suffering from withdrawal symptoms. (*Id*. at 39-40.) Dr. Greenfield also discussed his treatment of Backes. He first began treating Backes for Attention Deficit Hyperactivity Disorder in January of 2010. (*Id*. at 42.) At that time, Backes told Dr. Greenfield that he had an opiate addiction and that he was taking Suboxone. (*Id*. at 43.) He saw Backes seven more times prior to Backes's death. (*Id*. at 44.) During one of those visits, Backes sought additional Suboxone to ease his opiate withdrawal symptoms. (*Id*. at 43.) Dr. Greenfield gave Backes seven Suboxone pills and told him to return in a week, at which point Backes received one more week's worth of the drug. (*Id*. at 47.)

Dr. Richard Fruncillo, the Government's toxicology and pharmacology expert, explained that Backes "died either as the result of this very, very high Oxycodone level in combination with the Xanax or the Alprazolam or he died as a combination of the Oxycodone, the Alprazolam, and the cocaine." (*Id*. at 70-71, 103-04.) He believed that Oxycodone caused Backes's death because "this level was so high." (*Id*. at 72.) The cocaine level found in Backes was well below the mean lethal

levels reported in the medical literature. (*Id*. at 73.) Based on Backes's cocaine level, "cocaine could not have caused his death alone." (*Id*. at 73-74.) Dr. Fruncillo also testified that Backes had none of the indicators seen in people who died from low levels of cocaine, including heart problems. (*Id*. at 74-75, 106.) He also believed that the lack of oxymorphone, a metabolite of Oxycodone, demonstrated that Backes died of an acute Oxycodone overdose. (*Id*. at 76-77.) He estimated that Backes would have needed to take 450 milligrams of Oxycodone to arrive at the level found in his system. (*Id*. at 77.) Dr. Fruncillo believed that based on the relatively low levels of Suboxone in Backes's system, Backes likely had little tolerance for Oxycodone, thus making it likely that the high level of Oxycodone in Backes's system caused his death. (*Id*. at 109-110.)

Dr. Richard Hamilton, a medical toxicologist, is a professor and the Chair of Emergency Medicine at Drexel University College of Medicine. (June 4, 2013 Trial Tr. at 42.) He believed that "[i]t was the combined effects of Oxycodone and cocaine that caused Mr. Backes's death." (*Id*. at 49.) Dr. Hamilton could not "pick one of those drugs and say, this is the one that caused it, and this one didn't cause it." (*Id*.; *see also id*. at 60 ("This is a combined drug overdose, and you cannot pick one or the other drug when they're both present in fatal amounts to select it out to say, well, this is the one that was the fatal drug." ).) He testified that there are no safe blood levels of cocaine and that individuals have survived with the levels of Oxycodone in Backes's system. (*Id*. at 52-53.) Dr. Hamilton also opined that Backes was tolerant to Oxycodone based on a previous overdose Backes had suffered shortly before his death as well as Backes's heroin use. (*Id*. at 54-57.) Dr. Hamilton also challenged Dr. Fruncillo's conclusion that Backes did not have heart problems. Although he agreed that Backes had not suffered a heart attack, Dr. Hamilton noted that Backes's heart was not examined under a microscope, which would have been necessary to determine the condition of the heart. (*Id*.

at 65.) Dr. Hamilton also stated that many patients die of fatal arrhythmia despite normal-looking hearts. (*Id*.) He testified that the baggies found inside of Backes are not waterproof and that the cocaine found in those baggies could have leaked into Backes's body. (*Id*. at 68.)

On cross-examination, Dr. Hamilton agreed that the cocaine in Backes's system at his death was not very high. (*Id*. at 81.) He further testified that Backes ingested a large number of pills to arrive at the amount found in his system. (*Id*. at 82-83.) Indeed, Backes's Oxycodone levels were above the mean level of deaths reported in other cases. (*Id*. at 84.)

> b.     *The law of but for causation*

What killed Nathaniel Backes? Dr. Werther and the Government agree that to sustain Dr. Werther's conviction for Backes's death, the Government must prove beyond a reasonable doubt that the Oxycodone Dr. Werther prescribed was a but for cause of that death. With respect to the charge relating to the death of Backes, the Court instructed the jury:

> Count thirty-eight of the third superseding indictment charges Dr. Werther with distributing and dispensing a mixture or substance, specifically Oxycodone, outside the usual course or professional practice and not for a legitimate medical purpose, and the use of the Oxycodone distributed or dispensed by the defendant resulted in the death of Nathaniel Backes.

> To find Dr. Werther guilty of this charge, you must find that the government has proved beyond a reasonable doubt each of the elements of distribution or dispensing of a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose which I have just explained to you. In addition to those elements, you must also find that the government has proven beyond a reasonable doubt that the Oxycodone distributed by the defendant resulted in the death of Nathaniel Backes.

> In order to establish that the Oxycodone distributed or dispensed by the defendant resulted in Nathaniel Backes's death, the government must prove that Nathaniel Backes died as a consequence of his use of the Oxycodone that the defendant distributed or dispensed on or about the date alleged in the third superseding indictment, which is September 1, 2010. The law provides that whenever

death is a consequence of the use of a controlled substance that has been distributed or dispensed by the defendant, a more serious offense is committed, regardless of whether the defendant knew or should have known that death would result. There is no requirement that the death resulting from the use of the controlled substance was a reasonably foreseeable event. A finding by you that, but for Nathaniel Backes's ingesting the charged controlled substance distributed or dispensed by the Defendant, Nathaniel Backes would not have died, satisfies this standard. The fact that Nathaniel Backes may have used other drugs in addition to Oxycodone is not relevant, if you determine that he would not have died without ingesting Oxycodone.

Dr. Werther does not challenge the "but for" causation standard outlined in the Court's charge. (Werther Mem. at 20 ("This "but for" causation standard is well established.").) Rather, Dr. Werther asserts that because Backes died of a multiple-drug overdose, the Government failed to carry its burden.

Courts have grappled with the exact meaning of the causation requirement in the statute. For example, in *United States v. Hatfield*, 591 F.3d 945 (7th Cir. 2010), the court reviewed a conviction for distribution of controlled substances, the use of which resulted in four deaths and serious bodily injury to a fifth user. The trial court instructed the jury that the "controlled substances distributed by the defendants had to have been 'a factor that resulted in death or serious bodily injury,' and that although 'they need not be the primary cause of death or serious bodily injury,' they 'must at least have a played a part in the death or in the serious bodily injury.'" *Id*. at 947. The Seventh Circuit held that these instructions were improper and ordered a new trial. The court stated that the government at least must prove that the death or injury would not have occurred had the drugs not been ingested. *Id*. at 948.

Although the court concluded that a new trial was required because the trial court's improper jury instructions were not harmless, the court's analysis is helpful here. That is because the *Hatfield*

court suggested that the evidence would have been sufficient to convict under the proper legal standard. The *Hatfield* court believed that:

> "The evidence regarding the cause of the serious injury of the one victim and the deaths of the others, though strong enough to justify a verdict of guilt beyond a reasonable doubt, was not conclusive. In each case the victim was found to have taken multiple drugs, some probably or possibly not distributed by the defendants. In the case of the nonfatal injury (respiratory arrest), the testifying physician thought it more likely that the drug probably supplied by the defendants had caused the injury rather than the cocaine that the victim had also ingested, but he did not rule out the possibility that the cocaine was responsible. With regard to another victim, the medical evidence was that the methadone he apparently received from one of the defendants 'would have been sufficient to kill him.' But he had another drug in his system and it is unclear how a juror would have fitted that evidence to the 'played a part' and 'primary cause' templates that he was asked to use to interpret 'result from.'"

*Id*. at 950.

Here, a properly instructed jury performed it role by determining the factual question of what killed Backes. It is not the role of this Court to now overturn that factual finding. Moreover, the *Hatfield* court was not bothered that the evidence was not conclusive about the cause of death. In cases involving death potentially caused by multiple drugs, a guilty verdict should be affirmed if the controlled substance distributed by the defendant was present in sufficient quantities to be fatal. *See, e.g.*, *United States v. MacKay*, 715 F.3d 807, 829-31 (10th Cir. 2013) *United States v. Washington*, 596 F.3d 926, 944 (8th Cir. 2010); *United States v. Krieger*, 628 F.3d 857, 869-71 (7th Cir. 2010). Considering that those whose demise is the result of an overdose often ingest multiple drugs, it would be unjust if drug distributors could take advantage of that fact to escape liability.

In this case, the Government's burden was to show that there was a but for causal connection between Oxycodone and Backes's death. *See Untied States v. Pacheco*, 489 F.3d 40, 47 (1st Cir. 2007). Based on the evidence in this case, a reasonable jury could—but was not obligated

to—conclude beyond a reasonable doubt that the Oxycodone prescribed by Dr. Werther was a but for cause of Backes's death. Granting Dr. Werther's motion for acquittal on this charge would usurp the role of the jury to listen to the evidence and make credibility determinations. A reasonable jury could find beyond a reasonable doubt that, absent the cocaine, the Oxycodone killed Backes. That is enough to sustain the jury's verdict.

Though the Third Circuit has never directly addressed the specific question of what evidence is necessary to sustain the conviction of a doctor who prescribed medication outside the usual course of professional practice and not for a legitimate medical purpose, the Third Circuit's decision in *United States v. Robinson*, 167 F.3d 824 (3d Cir. 1999), is instructive. In that case, Robinson sold heroin to Ronald Bungar. Bungar delivered the heroin to Michael Minchoff and Minchoff's girlfriend, Bettina Allison. Allison injected the heroin and Minchoff injected a speedball, a mixture of equal parts cocaine and heroin, from the heroin and cocaine Bungar had obtained earlier. Allison died of an overdose the next day, and Minchoff died of an overdose later that day or within the next few days. An autopsy performed on Allison confirmed that she died from a heroin overdose and that her blood also contained cocaine, codeine, ethanol, and cannobinoids. An autopsy performed on Minchoff confirmed that he also died of a heroin overdose. The district court found that the Government proved by clear and convincing evidence that Allison's death resulted from the heroin that Robinson delivered to Bungar, but that the Government failed to prove by clear and convincing evidence that Minchoff's death resulted in whole or in part from the heroin that Robinson delivered to Bungar. Because Allison's death was caused by heroin distributed by Robinson, the district court applied to Robinson the twenty-year mandatory minimum pursuant to 21 U.S.C. § 841(b)(1)(C). In *Robinson*, the Third Circuit held that a court could impose the sentencing enhancement on a

11

defendant whose drug distribution caused the death of another, even without a showing of proximate cause. 167 F.3d at 830-31. "In short, Congress recognized that the risk is inherent in the product and thus it provided that persons who distribute [controlled substances] do so at their peril. It is obvious Congress intended in such a case that the 20-year mandatory minimum would apply if death or serious bodily injury resulted from the use of the substance without regard for common law proximate cause concepts." *Id.* at 831. Numerous other courts of appeals have also held that the statute contains no foreseeability requirement. *See Untied States v. Webb*, 655 F.3d 1238, 1250-55 (11th Cir. 2011) (citing cases from the First, Second, Third, Fourth, Eighth, and Ninth Circuits).

The lack of a foreseeability requirement in the statute highlights the level of culpability required to convict. Congress dictated that those who distribute controlled substances are liable for deaths resulting from that distribution. Provided a reasonable jury could conclude that Dr. Werther prescribed the Oxycodone that was a but for cause of Backes's death, it is not necessary that Dr. Werther foresaw that result. It is undisputed that Backes had a lethal dose of Oxycodone in his system at the time of his death. The jury was free to believe the expert testimony that Backes had a very large amount of Oxycodone in his system and that he did not have a significant amount of cocaine in his system at the time of his death. Dr. Fruncillo testified that, given the amount of cocaine in his system, he would have expected that Backes suffered heart damage. Because there was no evidence that Backes suffered heart damage, Dr. Fruncillo did not believe that the cocaine killed Backes. He also opined that Backes's tolerance threshold for Oxycodone was lowered and therefore the large amount of Oxycodone he ingested caused his death.

The Court also understands that Dr. Werther wants this Court to infer that Backes's addictions and Oxycodone tolerance warrant reversal of his conviction on this charge. Backes abused

Oxycodone and previously took large quantities of the drug without dying. Dr. Werther appears to argue that the cocaine must therefore be responsible for Backes's death. But that is not the only conclusion that a reasonable jury could reach, and the Court will not substitute its decision for that of the jury. A reasonable jury could conclude the massive amount of Oxycodone that Backes ingested that killed him.

c.      *Outside the usual course of professional practice*

Dr. Werther seeks to reverse his convictions for prescribing Oxycodone to Backes outside the usual course of professional practice and not for a legitimate medical purpose. (Werther Mem. at 18-19.) The battle of the experts regarding Dr. Werther's decision to prescribe Oxycodone to Backes is not a reason to overturn the jury's verdict on these counts. A reasonable jury could conclude that Dr. Werther's decision to prescribe to an addict his drug of choice was outside the usual course of professional practice and not for a legitimate medical purpose.

The Court gave the jury the following instruction about dispensing controlled substances outside the usual course of professional purpose and not for a legitimate professional purpose:

> The final element that the Government must prove beyond a reasonable doubt is that Dr. Werther distributed or dispensed a controlled substance other than for a legitimate medical purpose and in the usual course of his professional practice.
>
> A licensed physician such as Dr. Werther is authorized to prescribe drugs only when he is acting as a physician. In making a medical judgment concerning the right treatment for an individual patient, physicians have discretion to choose among a wide range of available options. Therefore in determining whether Dr. Werther acted without a legitimate medical purpose, you should examine all of his actions and the totality of the circumstances surrounding those actions.
>
> Dr. Werther contends that he prescribed controlled substances in good faith. As I instructed, the offenses charged in the indictment require proof that Dr. Werther knowingly and intentionally distributed controlled substances. If you find that Dr. Werther acted in good faith, that would be a complete defense for this charge because

good faith on the part of Dr. Werther would be inconsistent with his acting knowingly and intentionally. A person acts in good faith when he or she has an honestly held belief of the truth of the statements being given to him even though the belief turns out to be inaccurate or incorrect. Good faith in this context means good intentions and the honest exercise of good professional judgment as to a patient's medical needs. Good faith connotes an observance of conduct in accordance with what the physician should reasonably believe to be proper medical practice.

Dr. Werther does not have the burden of proving good faith. Good faith is a defense because it is inconsistent with the requirement of the offenses that he acted knowingly and intentionally. As I have instructed you, the government must prove Dr. Werther's mental state beyond a reasonable doubt.

In deciding whether the Government proved that Dr. Werther acted knowingly and intentionally, or instead whether Dr. Werther acted in good faith, you should consider all the evidence presented in the case that may bear on Dr. Werther's state of mind. If you find from the evidence that Dr. Werther acted in good faith or that the government failed to prove beyond a reasonable doubt that he acted knowingly or intentionally, you must find Dr. Werther not guilty of distributing or dispensing a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose.

In your experiences, some of you may be familiar with or have heard of medical malpractice or the standard of care. This is not a medical malpractice case. Those terms are used in civil cases when a patient is seeking damages. Medical malpractice is the unwarranted departure from generally accepted standards of medical practice allegedly resulting in injury to a patient. This, however, is a criminal case, and you must apply the instructions I am giving to you now and determine whether Dr. Werther distributed or dispensed a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose. You are not deciding whether Dr. Werther should be liable for medical malpractice.

Dr. Stephen Thomas, a board certified anesthesiologist with a subspecialty certification in pain medicine, testified as an expert for the Government. His practice has focused exclusively on pain management since 1999. (May 17, 2013 Trial Tr. at 7.) He discussed what it means for a doctor to practice within the usual course of professional practice for a legitimate medical purpose: "In the practice of medicine when we draw back the veil it really comes down to whether or not the physician is practicing on the individual who is in front of him and making the decisions and the

manner of the decision making based upon the individualization of the medical care involved." (*Id.* at 10.) He discussed various types of pain and treatments for them. He also discussed the risks associated with using pain medication, including addiction and diversion of drugs to unintended users. (*Id.* at 13.) According to Dr. Thomas, once the doctor has diagnosed the patient and is able to understand the patient's pain, the doctor should start at the bottom of the pain relieving ladder to determine if medication is necessary to treat the patient. (*Id.* at 15-18.) If the doctor deems opioids an acceptable method of treatment for a particular patient, the doctor should start with a low dose to see how the patient responds. (*Id.* at 18-19.)

Dr. Thomas discussed Dr. Werther's treatment of Backes. Backes was taking Suboxone, a medication used to treat pain and addiction. (*Id.* at 80.) Dr. Werther rapidly increased Backes's Suboxone dose. (*Id.* at 81.) He also prescribed Xanax to Backes. (*Id.* at 82-83.) Dr. Werther also noted in his files that Backes was buying Percocet and Oxycontin for lower back pain. (*Id.* at 85.) Although Backes told Dr. Werther that he was using Oxycodone, Dr. Werther failed to properly monitor Backes using drug screens and counseling. (*Id.* at 81-82.) Dr. Werther noted that Backes told him that he loved Oxycodone and that he no longer wanted to remain on Suboxone. (*Id.* at 83-84.) According to Dr. Thomas, "[t]here is no clearer definition of the workings of the brain of the addicted individual . . . who has come to him because this drug has been destroying his life, is trying to get clean . . . but instead still wants the drug that is causing him such a problem." (*Id.*) At first, Dr. Werther refused to accede to Backes's request to give him the drug that he sought. (*Id.* at 84.) Eventually, Dr. Werther prescribed Oxycodone for Backes.

Dr. Thomas opined that Dr. Werther's actions respecting Backes "cannot be legitimate medical practice for a patient who has come to you stating that I have addictive illness . . . [t]o switch

15

from high – to high dose Oxycodone from Suboxone is not medically reasonable and necessary, particularly in this patient with this level of ad lib taking. That is, he doesn't give him a week's supply, he gives him a total of 180 tablets of Oxycodone as if this person who has said I love Oxycodone, Oxycodone rules me, I am out of control with Oxycodone, I crave Oxycodone, he has the disease of addiction and he gave him his drug of choice." (*Id*. at 87.) According to Dr. Thomas, prescribing Oxycodone to Backes was not within the usual course of professional practice or for any legitimate medical purpose. Dr. Thomas testified:

> Mr. Backes complained of back pain. He complained of back pain that came on while he was playing tennis. He did not have any diagnostics studies. There was limited physical examination and there was no attention to the fact that he had an underlying disease of life-threatening proportions. It – there was no attention to the fact that the appropriate treatment for Mr. Backes is to do first things first, second things second and third things third, that the treatment should have been with physical therapy, with modalities, with massage, with heat, with ice, with non-steroidal anti-inflammatory agents, with antidepressants, with anything but Oxycodone. If you were going to use an opioid, then the use of opioids in addicted individuals – which can occur – should be in a measured and controlled fashion. It should be with close monitoring of the way in which they're taking the opioids with short scripts. That is, as opposed to giving him 180 tablets at once, why not give him 20? Why not give him 30? You know he's going to abuse them. You know because he's told you I love Oxies. Love for a drug is not a normal response and, therefore, the physician has an obligation to have a response that is metered by what the patient tells them. This was not.

(*Id*. at 88-89.) Dr. Thomas's opinions were challenged by Dr. Werther's lawyers and experts. But the jury was provided with sufficient evidence to conclude that Dr. Werther's treatment of Backes was outside the usual course of professional practice and not for a legitimate business purpose.

### 2. Distribution counts

Dr. Werther was convicted of 186 counts of distribution of Oxycodone outside the usual course of professional practice and not for a legitimate purpose. Dr. Werther seeks a judgment of acquittal on sixty of those counts because "[t]he Government failed to offer *any* patient *or* expert

testimony (specific or pattern)" with respect to those counts. (Werther Mem. at 4.). He seeks a judgment of acquittal on ninety-two of those counts because "the Government relied solely on expert testimony regarding general patterns of alleged inappropriate prescribing behavior." (*Id*. at 10.)

The Court instructed the jury that to convict Dr. Werther of distributing and dispensing a mixture or substance containing a controlled substance, specifically Oxycodone, outside the usual course of professional practice and not for a legitimate medical purpose, the Government was required to prove the following elements beyond a reasonable doubt as to each distribution count: (1) that Dr. Werther distributed or dispensed a controlled substance; (2) that he acted knowingly and intentionally; (3) that the controlled substance was Oxycodone; and (4) that he did so other than for a legitimate medical purpose and in the usual course of his professional practice. The Court also provided specific instructions to the jury on the meaning of legitimate medical purpose and good faith.

Dr. Werther relies largely on *United States v. Tran Trong Cuong*, 18 F.3d 1132 (4th Cir. 1994) to support his argument that he is entitled to a judgment of acquittal or a new trial. In that case, Dr. Tran was convicted of 127 counts of unlawful distribution of controlled substances based on prescriptions to thirty patients. The government offered the testimony of seven former patients "who testified that Tran's physical examinations had been perfunctory, that they faked their symptoms of pain . . . that Tran frequently reminded them that he could not give them medication unless they told him they were in pain, and that Tran suggested that they fill the prescriptions at different pharmacies." *Id*. at 1134. In addition, a government medical expert reviewed thirty-three charts of patients listed in the indictment and prepared a written report summarizing the information on each patient. *Id*. at 1135. The court noted that eighty counts in the indictment related to twenty patients

who did not appear or testify at the trial. *Id*. The government supported these counts through the medical expert's testimony and the summary that he prepared. *Id*. With respect to these counts, the court held, "[a] review of the evidence persuades us that the government has not carried its burden of proving defendant's guilt on these counts beyond a reasonable doubt." *Id*. at 1141. The government medical expert "did not mention any of the 20 patients who did not testify. . . . He did not discuss these patients by name nor did he comment on the prescriptions they had received. He neither examined nor interviewed any of these patients. No effort was made by the prosecution to focus his testimony on any of these 80 counts." *Id*. The court was concerned that, given the paucity of evidence to support these counts, the defendant may have been convicted based on the association of the counts properly proved with those that were not. *Id*. The court referred to the government's case as a "classic case of 'overkill' . . . [that] invite[d] a jury to find guilt by association or as a result of a pattern." *Id*. at 1142.

Dr. Werther's arguments raise the question of what evidence is required to convict a physician for each count of distribution of controlled substances outside the usual course of professional practice and not for a legitimate medical purpose. "A defendant is entitled to individual consideration of every count in an indictment by the jury and evidence sufficient to convict on each count beyond a reasonable doubt, if he is to be convicted." *Tran Trong Cuong*, 18 F.3d 1132, 1142. Individual consideration is difficult here because the jury was required to consider over 300 counts. Ultimately, however, the Court concludes that the Government has submitted evidence sufficient to sustain its burden of proving all of the elements of the distribution counts upon which the jury convicted Dr. Werther. Unlike the situation in *Tran Trong Cuong*, the Government presented evidence here that Dr. Werther was the center of a number of conspiracies and that the very purpose

18

of those conspiracies was to transport fake patients to obtain prescriptions they did not need so that the pills could be sold. Thus, none of the patients in these groups were legitimate and none of them should have received prescriptions for Oxycodone. There was testimony from which the jury could conclude that Dr. Werther knew who the fake patients were, specifically, that he was aware of the drivers in each of the various groups. Additionally, evidence about the perfunctory nature of Dr. Werther's examinations, coupled with his willingness to hand out prescriptions to all of the patients in the various drug trafficking groups provided a sufficient basis for the a jury to conclude that Dr. Werther prescribed Oxycodone to these individuals outside the usual course of professional practice and not for a legitimate medical purpose.

The record contains ample evidence identifying the individuals involved in the conspiracies charged by the Government in this case. For example, Anthony DiPasquale, who was the leader of one of the groups of patients, testified about the individual patients in his group. Furthermore, the Government introduced the medical files of those persons in DiPasquale's group. DiPasquale testified that he drove the following individuals to Dr. Werther's office to obtain controlled substances: Nicholas Carbone, Kelly Ann Dougherty, Andrea Ellis, Valerie Gilmore, Charles Harvey, Antoine Kelly, Ralph Kelly, Karen Leonard, Thomas Leonard, George McCarthy, Patricia Jane McCarthy, Amber Meyer, Erin Meyer, James Shuster, Eric White, Michael White, Nicholas White. (May 7, 2013 Trial Tr. at 120.) Critically, he also testified that Dr. Werther knew of the individuals in DiPasquale's group. (*Id*.) The Government also reviewed with DiPasquale the medical files of those in DiPasquale's group. (May 8, 2013 Trial Tr. at 8-22.) DiPasquale also testified that Orlando Santiago was in his group and became a driver for DiPasquale after DiPasquale was arrested for drug possession and therefore stopped driving people to Dr. Werther's office. (*Id*. at 136.)

Similarly, Kyle Jones testified that the following people were in his group: Shianna Dawkins, Quinton Gamble, Wayne Saunders. (May 15, 2013 Trial Tr. at 54, 64.) Rashida Lyles identified Ferdinand Nieves as member of Angel's group. (May 16, 2013 Trial Tr. at 23.) Therefore, even if there were patients who did not take the stand and who were not mentioned by a Government expert, the record contained evidence of the drivers, the patients involved in each group, as well as testimony that would allow the jury to infer that Dr. Werther knew the players involved in the conspiracies. Finally, the Court notes that the jury acquitted Dr. Werther of several of the distribution counts against him, which lessens the likelihood that the jury convicted Dr. Werther based on guilt by association. *See United States v. Bourlier*, App. A. No. 11-15268, 2013 WL 1979624, at *2 (May 15, 2013).

There is evidence from which a reasonable jury could conclude that the Government sustained its burden of proof on the distribution counts. Evidence was introduced that supports the conclusion that the individuals who received prescription pain medication from Dr. Werther were not legitimate patients, and that Dr. Werther knew that members of these groups were not legitimate patients, or was willfully blind to that fact.

Similarly, the Court sees no reason to grant Dr. Werther's motion for a new trial on the conspiracy or distribution counts. Dr. Werther argues that the weight of the evidence did not support the convictions because the patients lied to Dr. Werther and deceived him into prescribing Oxycodone. (Werther Mem. at 30-31.) Additionally, the testimony established that Dr. Werther's staff falsified medical records and kept Dr. Werther "in the dark" regarding their deceitful behavior. (*Id*. at 31.) Dr. Werther also notes that he spent years practicing medicine without incident and that he presented evidence that he had "a long track record of trusting people . . . even when such trust

was ill advised. . . . The evidence at trial showed a nice, elderly man who was utterly deceived and utterly used by a series of bad people." (*Id*. at 31-32.) Finally, Dr. Werther contends that his former employees hid the various drug conspiracies operating within the office. (*Id*. at 32-35.)

This was Dr. Werther's theory of the case. But it was not the theory that the jury believed and there was sufficient evidence in the record to disagree with that theory. Additionally, the belief that Dr. Werther's staff was comprised of deceitful, manipulative individuals—some of whom pled guilty—is not inconsistent with a finding that Dr. Werther was guilty. The Court specifically instructed on willful blindness to allow for the possibility that this was a case in which "Dr. Werther deliberately closed his eyes to what would otherwise have been obvious to him." Dr. Werther wrote all the prescriptions and was the leader of the office. There was testimony about Dr. Werther's perfunctory medical examinations and the ease with which he prescribed powerful painkillers. That his staff workers also engaged in illegal activities, some of which Dr. Werther might have been unaware of, does not foreclose a finding that Dr. Werther abused his power by writing prescriptions for persons who he knew were planning to sell the pills. Finally, Dr. Werther's personality traits cannot absolve him of guilt provided the Government presents evidence sufficient to convict. Such traits and his past behavior are entitled to consideration, but they are insufficient to support granting a new trial.

### 3. *Money laundering*

Dr. Werther was convicted of numerous counts of money laundering. He now seeks a new trial on those counts because he claims that the convictions were against the weight of the evidence. The Court instructed the jury that to convict Dr. Werther of money laundering, the Government had to prove beyond a reasonable doubt that Dr. Werther: (1) conducted a financial transaction, which

affected interstate commerce; (2) conducted the financial transaction with the proceeds of a specified unlawful activity; (3) knew the financial transaction involved the proceeds of some form of unlawful activity; and (4) conducted the financial transaction with knowledge that the transaction was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity.

The Government presented the testimony of Richard McCloskey, a senior financial investigator with the Drug Enforcement Administration ("DEA"). McCloskey investigated Dr. Werther's financial dealings with respect to Dr. Werther's medical practice. He discussed how sequentially numbered money orders that Dr. Werther insisted his patients use for payment were deposited into three separate bank accounts on the same day. (May 21, 2013 Trial Tr. at 107, 114-120.) This evidence is sufficient to conclude that Dr. Werther knew that the money was connected to illegal activity and he knowingly conducted financial transactions to conceal that fact. Additionally, the Government played for the jury a recorded conversation between Dr. Werther and his accountant in which Dr. Werther expressed concern because he had learned that the DEA was looking into his prescription writing. (Gov't Ex. T-A-25.) He discussed with his accountant how he practiced medicine; a jury could infer from the content of the conversation that Dr. Werther was concerned about the prescriptions he was writing and was seeking reassurance from his accountant that his financial dealings would not be a problem. (*Id*.) There was evidence that Dr. Werther's accountant was concerned because he called Dr. Werther back shortly after the initial phone call and advised him to "get an attorney" and "talk to the DEA directly." (June 5, 2013 Trial Tr. at 37.)

The Court concludes that the evidence presented was sufficient to establish Dr. Werther's knowledge and thus to sustain the Government's burden on the money laundering charges.

**B.      Angel Duprey's Motion for Judgement of Acquittal or a New Trial**

The jury convicted Angel Duprey of one count of conspiracy to distribute a controlled substance outside the usual course of professional practice and not for a legitimate medical purpose. Duprey was acquitted of six counts of health care fraud. He seeks an entry of acquittal on the conspiracy charge or in the alternative, a new trial.

Similar to the arguments by Dr. Werther, Duprey argues that the Government failed to present evidence that the patients associated with Duprey were not legitimate pain patients, instead relying solely on patient medical records or general patterns of alleged inappropriate prescribing behavior. (Duprey's Memo. of Law in Supp. of His Mot. for J. of Acquittal or, in the Alternative, Mot. for a New Trial [Duprey Mem.] at 3-4.)

The record contains ample evidence to convict Duprey of being a member of a drug distribution conspiracy. For example, Efrain Rivera testified that Duprey paid him to pick up patients, take them to Dr. Werther's office and then drive them to the pharmacy to fill the prescriptions written by Dr. Werther. (May 10, 2013 Trial Tr. at 35-36.) Rivera said that he was sometimes paid in cash but also paid in "Percocet or oxy" and that he accepted pills as payment because he was addicted to pain medications. (*Id*. at 36.) Duprey also gave Rivera money to pay Dr. Werther's office visit fee. (*Id*. at 38.) Rivera testified that many of the people whom he drove to Dr. Werther's office "looked homeless and like drug addicts," and that he often transported patients who were drunk or high. (*Id*. at 40-41.) Despite their appearances, these patients would return from their appointments with Dr. Werther with a prescription for pain medication. (*Id*. at 42.) Rivera admitted to coaching patients about what to say to Dr. Werther to ensure that they received a prescription. (*Id*. at 43.) He translated for Dr. Werther on numerous occasions. (*Id*. at 44-46.) At some point, Rivera

became a patient of Dr. Werther, lying about back pain to convince Dr. Werther to write him a prescription. (*Id*. at 47-48.) Rivera sometimes sold to Duprey the pain medication that Dr. Werther prescribed. (*Id*. at 48.) Rivera would at times fall out of character; he sometimes did not act as though he suffered from back pain when transporting patients to Dr. Werther. (*Id*. at 49-50.)

Christopher Pizzo, another Government witness, testified that Duprey sold him pills that had been prescribed by Dr. Werther two to five times a week. (May 10, 2013 Trial Tr. at 120-22.)

Duprey's own statements provide additional evidence from which a reasonable jury could conclude that he was guilty of conspiracy. At one point, he told Dr. Werther's wife that "the pill factory was coming down." (May 20, 2013 Trial Tr. at 54.) And during a recorded phone call between Duprey and one of Dr. Werther's receptionists, Rita Myles, Duprey expressed anger because Dr. Werther refused to see Duprey's patients unless Duprey paid for visits. (Gov't Ex. T-A-11.) Duprey pleaded with Dr. Werther to see the patients, promising to pay the following day. Duprey stated, "that's crazy, so he can't look out for my people one day, that's crazy. . . . All these years and he can't look out for my people one day?" (*Id*.) Myles said that she spoke with Dr. Werther, but he refused to see Duprey's patients. (*Id*.) In a call recorded moments later, Duprey said that a lot of the patients Dr. Werther had were because of Duprey. (Gov't Ex. T-A-12.) This statement is consistent with testimony from individuals who worked in Dr. Werther's office that Duprey brought had a group of patients to Dr. Werther. (*See, e.g.*, May 16, 2013 Trial Tr. at 18, 23.)

There is abundant evidence in the record that Duprey was part of a conspiracy to distribute controlled substances. Moreover, as this Court has rejected Dr. Werther's arguments, Duprey's arguments that Dr. Werther was not acting outside the usual course of professional practice and not for a legitimate medical purpose also fail. The Court concludes that Duprey is not entitled to a

judgment of acquittal or a new trial.

**III.     CONCLUSION**

Having reviewed the voluminous record from this lengthy trial, the Court finds that there is no basis to overturn the convictions of Dr. Werther or Duprey, nor is there a reason to grant a new trial to either Defendant. Defendants' motions are denied. An Order consistent with this Memorandum will be docketed separately.